**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| **NEIL HUGHES** | |
| *Plaintiff,* | |
| **v.** | Civil Action No.:   3:23cv00037 |
| **THE CITY OF CHARLOTTESVILLE d/b/a CHARLOTTESVILLE CITY PARKS AND RECREATION,** | **DEMAND FOR JURY BY TRIAL** |
| *Defendant.* | |

## COMPLAINT

COMES NOW Plaintiff, Neil Hughes ("Plaintiff" or "Hughes") by and through undersigned counsel and files this Complaint against Defendant, The City of Charlottesville d/b/a Charlottesville City Parks and Recreation ("Defendant" or "The City"). Mr. Hughes brings claims against Defendant for retaliation and violations of the American with Disabilities Act ("ADA") 42 U.S.C. § 12101 et seq. and the Rehabilitation Act of 1973 29 U.S.C. § 701 et seq.

## JURISDICTION AND VENUE

1. Federal question subject

2. U.S.C. § 701 and 42 U.S.C. § 12117(a).

3. The Court has personal jurisdiction over the Defendant as The City is located in Charlottesville, Virginia.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391. The acts and omissions alleged herein occurred within this judicial district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.      Prior to instituting this suit, Hughes timely filed a Charge of Discrimination with the Virginia Office of Civil Rights and Equal Employment Commission ("EEOC") alleging retaliation and discrimination based on his disability.  A true and correct copy of Plaintiff's Charge is attached hereto as **Exhibit 1**.

6.      After more than 180 days, the EEOC issued Hughes a Right to Sue Letter ("RTS Notice") on or about March 24, 2023. A true and correct copy of Plaintiff's RTS Notice is attached hereto as **Exhibit 2**.

7.      Plaintiff has satisfied all administrative prerequisites to bringing this action.

## PARTIES

7.      Hughes currently resides in Radiant, Virginia.

8.      Defendant Charlottesville City Parks and Recreation is an agency of the City of Charlottesville located in the Commonwealth of Virginia.  At all times relevant, the employees employed by Charlottesville City Parks and Recreation acted as agents of The City of Charlottesville.

## STATEMENT OF FACTS

9.       Hughes is a disabled individual.  During childhood, he endured physical and psychological trauma, resulting in developmental delays.

10.     In 2000 and 2001, Hughes sustained spinal cord injuries.  A botched 2001 surgery to repair/fuse his spine resulted in no sensation in his lower extremities and he was confined to a wheelchair for a year.

11.     In 2006, Hughes sustained a cervical fracture. Hughes has endured multiple surgeries and participated in extensive physical and neurotherapy.

12.     Despite medical efforts, Hughes still endures physical limitations. For example, he qualifies for medically prescribed supportive footwear.  When wearing boots, he wears a carbon fiber prosthetic on his right foot to support his drop foot.  His left leg experiences numbness and a slower response to nerve signals.

13.     Hughes trained for the 2016 Winter Paralympics and earned a training grant from the Olympic Committee.

14.     Hughes has been diagnosed with autism spectrum disorder ("ASD"), a neurodevelopmental disorder that is characterized by persistent deficits in social reciprocity, nonverbal communicative behaviors used for social interaction, and skill in developing, maintaining, and understanding relationships.

15.     Hughes has also been diagnosed with Post Traumatic Stress Disorder ("PTSD") and Functional Neurological Disorder ("FND").  FND, also known as "Conversion Disorder" and "Functional Neurologic Symptom Disorder," refers to a group of common neurocognitive movement disorders caused by an abnormality in how the brain functions. The brain is unable to send and receive signals properly and there is a disconnection in the function of the lobes and emotional processing. Memory, concentration, cognition, and the processing of sensations also can be affected. FND causes symptoms that significantly interfere with functioning and coping with daily life.

16.     Since 2001, Hughes has been a participant in the Ticket to Work ("TTW") program. TTW is a federally funded employment program designed to provide Social Security disability beneficiaries help to enter the workforce and maintain employment with the goal of becoming economically self-supporting over time. While enrolled in the program, participants are afforded nine months of "trial work periods ("TWP")."  Each time the participant's income level exceeds

the federally mandated income limits, the participant loses a month of TWP.  Should the participant

lose all nine, he loses monthly SSDI payments.

17.     Under the TTW program, state and local governments could partner with the federal

government to support the program's participants.

18.     In August 2021, Hughes underwent extensive testing with the Department of Aging

and Rehabilitation Services to prove his work readiness and passed a "Functional Limitations"

test.

19.     To date, when agitated or stressed, Hughes' neurocognitive and psychological

disabilities are activated and he loses the ability to control his leg functions, often resulting in

severe spasms and cramps.  He tends to lose his balance and becomes susceptible to falls.  Hughes

must be purposeful when he is walking.

## Hughes' First Employment with City of Charlottesville

20.     In 2018, The City of Charlottesville Parks and Recreation hired Hughes as a

Seasonal Skatepark Instructor and Temporary Maintenance Worker with The City of

Charlottesville Skatepark ("Skatepark").

21.     The Skatepark is a "wheel friendly park" that is used by skate boarders, bicyclists,

in-line skaters and scooters.  The City hosts programs including after school programs, day camps,

instructional classes, special events, and professional exhibitions at the Skatepark. The Skatepark

is also a potential host for the Olympic trials.

22.     During his employment with the Skatepark, Vocational Rehabilitation Counsel Pat

Darr from the Virginia Department of Rehabilitation Services ("VDRS")[1] had been assigned to

---

[1] State Vocational Rehabilitation (VR) agencies operate as service providers under TTW.

assist Hughes.  VDRS works with disabled individuals with the preparation for, search for and retention of a job.

23.     Hughes directly reported to Matthew Moffett ("Moffett"), the Skatepark Manager. At the time of hire, Hughes notified Moffett that he was a participant in the Ticket to Work program and that Hughes desire was to gain full time employment.

24.     The Skatepark manager reported to the Programming Manager.  Moffett reported to Rilan Anthony through 2001.  Chris Carr replaced Anthony in 2001.

25.     The Program Manager reported to the Interim Director of The City of Charlottesville Parks and Recreation.  Vic Garber served as the Interim Director of The City of Charlottesville Parks and Recreation.  When applicable, both Anthony and Carr reported to Garber.

26.     Hughes excelled at the performance of his job duties.  Overall, his performance reviews were positive.

27.     Hughes developed a highly regarded skating program unlike anything ever previously offered at the Skatepark. The program created a trauma-informed skate school for kids diagnosed with attention deficit hyperactivity disorder (ADHD) and aimed to help kids calm down and neuro-regulate while skateboarding.  The program would later be featured in an April 16, 2021, article in the Washington Post.

28.     Moffett often republished verbatim Hughes' class description in local City Parks and Recreation catalogs year after year without the need to edit or modify any of Hughes' submissions.

29.     In April 2019, a full-time maintenance position became available.  Moffett knew that Hughes was seeking full-time employment and was qualified for that position but instead hired

Eric Lawson, a non-disabled and less qualified individual. Moffett told Hughes that Lawson was less qualified for the position.

30.     When Hughes inquired why he was not selected, Moffett replied that full time work would happen "eventually."

31.     On June 27, 2019, Hughes developed an inclusive adaptive "Parent and Me" class. Several families, including families with autistic members, loved the class and provided positive feedback online.

32.     In July 2019, Hughes developed a functioning Skate Park Board which successfully raised needed funds for the Skatepark.

33.     In August 2019, Moffett required Hughes to take paid CPR training which resulted in too many hours being added to Hughes timecard putting him over the SGA[2] limits, thereby eliminating one of the trial work periods allowed when transitioning to full-time employment. Hughes reiterated his needed to stay in the Ticket to Work program and to continue receiving his SSDI benefits until he can get a full-time position.

34.     In September 2019, Hughes was furloughed with the other seasonal and temporary employees.

**Hughes' Second Employment with City of Charlottesville**

35.     In 2021, Hughes wanted to return to continue the work he was doing at the Skatepark to help implement adaptive programming.

36.     Hughes' second term with the Skatepark was not as congenial as the first.  His employment would end with him being forced to resign because the workplace had become discriminatory, hostile, and retaliatory.

---

[2] Employment that provides income above a certain level is considered "substantial gainful activity," or SGA, and renders the recipient ineligible for Social Security Disability Insurance (SSDI), thereby jeopardizing their standing.

37.     On June 6, 2021, Hughes was rehired as a Seasonal Instructor and Part-time Maintenance Worker. Eric Lawson had been moved to City of Charlottesville Public Works in May 2021. Moffett stated that Lawson had been allegedly charged with committing a criminal offense and prohibited him from working with kids.  Despite this, Lawson was able to maintain full-time employee status.

38.     From June 2021 to October 2021, Moffett took advantage of Hughes by trying to compel him to do tasks outside his job description like climbing ladders and plumbing. He also tried to suggest that Hughes work on his personal residence to complete pipe retrofit and to do a basement bathroom remodel. Hughes refused.  Moffett stated, "I thought you needed more hours?" Moffett knew that Hughes hours were subject to the mandates of the TTW program.  Hughes responded that he needed a full-time position.

39.      Either Hughes would have to stay in the TTW program and comply with its mandates to continue to receive his SSDI benefits or leave the program by becoming a full-time employee.

40.     In May 2021, Moffett asked Hughes to pad his timesheet to include hours he did not work in order to inflate the Skatepark budget and receive more funding from The City of Charlottesville.  Hughes refused to do so.

41.     In August 2021, Hughes asked Moffett if he (Hughes) could coordinate with Adaptive Programming Manager, Sarah Blech, to incorporate more adaptive events for disabled individuals.  Moffett refused saying "don't step on toes."

42.     On September 14, 2021, and September 20, 2021, Adaptive Programming Manager Sarah Blech invited Hughes to educate adaptive campers about his ability to perform everyday

functions. The presentation is titled Life Balance. Blech proclaimed the event was a "wild success."

43.     On September 30, 2021, Hughes applied for an advertised full time Maintenance Specialist role.

44.     Athletic Programs Manager Chris Carr hired Hughes for the advertised Maintenance Specialist role. Hughes' expected start date was November 22, 2021.

45.     The City previously employed Eric Lawson (not disabled) in the Maintenance Specialist role and paid Lawson more for the same work, despite Lawson being less experienced with the Skatepark and its maintenance than Hughes.  Carr was aware of this fact but wanted Hughes to get the park in order and to pay him a lower salary compared to Lawson.

46.     In 2021, the instructional positions at the Skatepark were part-time positions. Several able-bodied employees were permitted to be full-time employees and still maintain their teaching positions.

47.     When Hughes was offered the full-time maintenance position, he was told by Carr in October 2021 that he cannot have both positions, instructor and maintenance specialist.

48.     By email dated October 2021 addressed to his supervisors, Hughes indicated he had been performing the same duties as the full time Maintenance Specialist role while employed as a part- time maintenance worker and requested a pay comparable to what Lawson received when he was a Maintenance Specialist. The City refused to increase Hughes pay.

**Hughes Complains of Discrimination and Requests Reasonable Accommodations**

49.     On October 20, 2021, at 6:44am, Hughes reached out to Ashley Reynolds Marshall, Deputy City Manager for Racial Equity, Diversity, and Inclusion for The City of Charlottesville. Hughes sent an email stating "I work for Parks and Rec and wondering who to talk to about a

possible violation of my civil rights.  Trying to understand if what is happening in my department is legal but offensive, or illegal and offensive."  He also left two voicemail messages on October 22, 2021, addressing his concerns. Marshall never returned or acknowledged his phone calls or undertook any steps to investigate his complaint.

50.     Instead, within minutes of his last call, Hughes received a telephone call from Interim Director of The City of Charlottesville Parks and Recreation Vic Garber, the head of the department of which he was complaining.  Marshall did nothing to protect or ensure that Hughes' civil rights were protected as required by federal and state law.  Instead, she redirected Hughes' complaints to Garber.   In that conversation. Garber indicated that he wanted to schedule a meeting with Hughes.

51.     On October 27, 2021, Hughes attended a meeting in a windowless office with Interim Director of Parks Vic Gaber and Human Resources Coordinator Flora Kelley-Bertsch.  At that meeting, Hughes requested a fixed work schedule and late start time to accommodate his disability -functional neurocognitive disorder ("FND").  Gaber stated that the accommodation requests were "unworkable."  Garber also screamed at Hughes and berated him for complaining about possible civil rights violations to Marshall.

52.     In the October 27, 2001, meeting, Garber told Hughes that Hughes was "immediately and forever" suspended from being an instructor at the Skatepark and on probation with regard to his maintenance duties.  Garber also indicated that Hughes was still expected to work excessive hours as a part-time maintenance person (in violation of TTW mandates) until his full-time maintenance position started in November 2021.

53.     In the same meeting Kelley-Bertsch accused Hughes of fabricating his diseases by manipulating his doctors.  In response, Hughes indicated that he would provide a letter from Dr. Donna Broshek, a neuropsychologist, to support his accommodation requests.

54.     On October 28, 2021, Hughes provided the letter from Dr. Broshek. The letter stated that Hughes has a history of severe psychological trauma, ongoing post-traumatic stress symptoms, and chronic pain.  The neuropsychologist recommended formal work accommodations: (1) a structured and standard work schedule, preferably a 10am -6pm workday, so that he can engage in stress management exercises and (2) additional occasional breaks to manage times of high stress.

55.     On November 4, 2021, Human Resources Coordinator Kelley-Bertsch acknowledged receipt of Hughes's accommodation request regarding his FND.

56.     On or about November 12, 2021, Athletic Programs Manager Chris Carr acknowledged that Hughes had made a separate accommodation request regarding the work schedule and mistakenly added necessary footwear to Hughes' accommodation request.

57.     The City never approved the accommodation requests as outlined in the October 28, 2021, letter.

58.     After Hughes' complaint to the Deputy City Manager for Racial Equity, Diversity, and Inclusion for The City of Charlottesville and requested reasonable accommodations, Moffett began to threaten and intimidate Hughes at work.  Moffett instructed him to stop being an "advocate" for his late start time, a reasonable accommodation request Hughes made previously.

59.     On November 12, 2021, Hughes received an angry call from Moffett at home.  His tone was belittling, aggressive and falsely accused Hughes of not following his directions.

60.     In November 2021 Moffett became more aggressive to Hughes warning him to stop being an "activist."  Hughes interpreted this as Moffett asking him to stop pursuing reasonable

accommodation requests because Moffett had previously admonished him to stop advocating for a later start time.

61.     By November 16, 2021, Hughes had not yet been onboarded for the full-time maintenance position. The City was still requiring Hughes to work more than part time hours in his part time maintenance role, again in conflict with the Ticket to Work program.

62.     The City's refusal to grant his reasonable accommodation requests and requirement that he work additional hours, along with Moffett's discriminatory, aggressive, and threatening accusations caused Hughes to feel he had no choice but to refuse the full-time maintenance position.

63.     On November 16, 2021, Hughes emailed The City inquiring about resigning from the full-time maintenance position also, in part, because of Moffett's angry and abusive phone call on November 12, 2021.

64.     Instead of investigating any of Hughes' complaints or interacting with him about his accommodation requests, Garber responded by drafting a resignation letter on Hughes' behalf agreeing to leave the full-time job in exchange for restoring his standing as a part time instructor in good standing.

65.     Hughes has always set his own hours. After his meeting with Garber and Kelley-Berstch, Moffett (in retaliation) required Hughes to arrive at work before 10am, contrary to his accommodation request for a late start time.

66.     On November 18, 201, Hughes was forced to resign from the full time Maintenance Specialist position.

67.     On February 4, 2022, Hughes filed a complaint of disability discrimination with the Virginia Office of the Attorney General- Office of Civil Rights.   On April 8, 2022, the complaint was transferred to the EEOC- Richmond Local Office.

68.     On or about February 21, 2022, Hughes notified The City via email that he filed a disability discrimination complaint.

69.     Moffett responded on February 22, 2022, requesting a meeting with Hughes.

70.     Due to his disabilities and neurocognitive issues and the prior meeting when Flora Kelley-Bertsch accused him of fabricating his disabilities, Hughes requested that the meeting take place in a space with windows or outside.   Additionally, in order to accommodate his neurocognitive disabilities, he requested that The City first produce an agenda and timeframe for how long the meeting would last in an email dated February 23, 2022.

71.     In the same email, Hughes notified The City that he would file complaints for discrimination and retaliation (a protected activity) with EEOC and the Virginia Office of the Attorney General.

72.     In response, on February 28, 2022, Kelley-Bertsch attempted to schedule a meeting with Hughes on March 1, 2002, disregarding his accommodation requests from a windowless office meeting location or to meet outside, an agenda and an indication about how long the meeting will last.  Hughes did not meet with Kelley-Bertsch.

73.     Kelley-Bertsch scheduled a second meeting for March 4, 2022, with Hughes again disregarding his request for accommodations at the meeting.  Hughes did not meet again.  Given Kelley-Bertsch early accusation that Hughes' disabilities were a fabrication and refusal to accommodate his disabilities, Hughes was understandably reluctant.

74.     On March 10, 2022, with the intervention of Pat Darr (Hughes' case manager at the Virginia Department of Aging and Rehabilitative Service), Kelley-Bertsch finally indicated that The City would provide accommodations for Hughes at the meeting due to his "anxiety," a mischaracterization and minimizing of the disabilities that he previously disclosed to The City.

75.     On March 15, 2002, Hughes notified Kelley-Bertsch that he had filed complaints with the EEOC and the Virginia Office of the Attorney General.

76.     On March 26, 2022, Darr suggested that Hughes walk away from working at the Skatepark because the workplace had become hostile and The City of Charlottesville did nothing to prevent the retaliatory and discriminatory actions of Garber, Moffett, Kelley-Bertsch.

77.      On or about March 23, 2022, Hughes was forced to resign.  He no longer worked for the City in any capacity.

78.     On July 14, 2022, Hughes formally filed a Charge of Discrimination with the Virginia Office of Civil Rights alleging discrimination based on disability and retaliation.

## COUNT I
## DISIBILITY DISCRIMINATION
### [42 U.S.C. § 12101 et seq.]

79.     Hughes incorporates by reference paragraph 1 to 78 above.

80.     The ADA makes it unlawful for employer to "discriminate against a qualified individual on the basis of disability in regard to . . .the hiring, advancement, or discharge of employees, …. and other terms, conditions, and privileges of employment." 42 U.S.C § 1212(a).

81.     To establish a claim for disability discrimination under the ADA, a plaintiff must prove (1) that he has a disability, (2) that he is 'qualified individual' for employment in question, and (3) that the employer discharged him because of his disability.  Jacobs v. North Carolina Admin. Off. Of the Courts, 780 F.3d.562, 572 (4th Cir. 2015).

82.     Hughes is a person with physical and neurocognitive disabilities.

83.     In addition to being actually disabled, Hughes has a record of disability and was perceived as disabled.

84.     Hughes qualified to participate in the Ticket to Work program, was receiving SSDI and produced medical records to support his disability claims.

85.     Hughes was perceived as disabled by those individuals employed by The City of Charlottesville City Parks and Recreation who saw his physical limitations and signs of his neurocognitive limitations, discussed his disabilities with him, reviewed his accommodation requests and paperwork and minimized his physical disabilities.

86.     Hughes is a qualified person with a disability and performed his job in line with employers' reasonable expectations.

87.     Hughes worked on and off from 2018 to 2022 for Defendant and was a successful and productive employee.

88.     Defendant never issued Hughes any write-ups, warnings, reprimands, or other disciplinary actions.

89.     Hughes was able to perform the essential functions of his job and could perform the functions of seasonal instructor, part-time maintenance, and full-time maintenance.

90.     Defendant repeatedly asked Hughes to work excessive hours even though he is enrolled in Ticket to Work, jeopardizing his SSDI payments and status with the program.

91.     Moffett targeted and repeatedly yelled at and demeaned Hughes.  He did not yell and demean Eric Lawson, an able-bodied employee similarly situated.

92.     Upon information and belief, Moffett did not target and repeatedly yell and demean any able-bodied employees.

93. Eric Lawson was allegedly accused of committing a felony but was transferred to another full-time position with The City of Charlottesville.

94. At the time of Hughes' hire, Moffett knew Hughes wanted a full-time position. Moffett knew Hughes was qualified for the maintenance role but offered it to Lawson, Moffett chose to hire the less experienced Lawson instead.

95. Hughes repeatedly requested a full-time position when Moffett was his supervisor but was often met with delay solely due to his disability.

96. The City did not prevent or discipline Moffett for incessantly harassing and discriminating against Hughes.

97. When Hughes was finally offered a full-time position, the job title and salary was less than the position offered to Lawson, although Lawson was less qualified, and Hughes would be performing the same job duties.  Moffett knew the position was a lesser position thereby he acted in a discriminatory and retaliatory manner.

98. Moffett directed Hughes to stop "advocating" for his accommodations, namely later start time.

99. Hughes was not permitted to maintain the full-time maintenance specialist position and his part-time instructor position, although nondisabled employee were.

100. Defendant constructively terminated Hughes by creating a hostile discriminatory work environment solely because he is disabled.  Defendant has no nondiscriminatory reason for constructively discharging Hughes.

101. Defendant did not terminate Lawson despite allegations of criminal behavior, instead choosing to transfer him.

102.    As an actual and proximate cause of Defendant's conduct, Hughes has suffered physical injury, emotional distress, embarrassment, humiliation, and lost wages and benefits.

103.    Due to Defendant's intentional disregard of Hughes's federally protected rights under the ADA.  Hughes seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendant.  Hughes seeks backpay and pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorneys' fees and litigation costs and expenses.

## COUNT II
## RETALIATION
## [ADA, 42 U.S Code § 12101 et seq.]

104.    Hughes incorporates by reference paragraphs 1 to 103 above.

105.    The ADA states that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

106.    Hughes engaged in protected activity by complaining about disability discrimination to The City (a practice made unlawful by the ADA).

107.    Hughes engaged in protected activity by complaining of retaliation and disability discrimination to Ashley Reynolds Marshall, Deputy City Manager for Racial Equity, Diversity, and Inclusion for The City of Charlottesville.

108.    Hughes notified Defendant that he intended to file an EEOC complaint with the EEOC and Office of the Attorney General.

109.    Hughes complained about the harassment and abuse by Moffett, Moffett retaliated and escalated his abusive behavior after Hughes accepted the promotion to a full-time position to work with Chris Carr.

110.    Hughes engaged in protected activity when he requested accommodations.

111.    After Hughes emailed and called Marshall's office and notified The City that he intended to file complaint with the EEOC and Office of the Attorney General, Garber retaliated by contacting Hughes and yelling at him for going over his head, threatening to immediately and permanently suspend him from teaching, threatening to place him on probation, and ultimately drafting a resignation letter.

112.    Moffett retaliated by requiring Hughes to report to work before 10am, contrary to his request for a late start time (an accommodation request).

113.    Flora Kelley-Bertsch retaliated and discriminated by accusing Hughes of requesting accommodations based on fabricated diseases or by manipulating his doctors.

114.    Flora Kelley-Bertsch retaliated by trying to conduct two (2) meetings without complying with Hughes accommodations requests.

115.    Defendant retaliated by creating a hostile work environment and forcing Hughes to resign.

116.    Defendant retaliated and subjected Hughes to an adverse employment action by refusing to approve any of his accommodation requests.

117.    Hughes' protected activity and Defendant's adverse employment action were causally connected and related.

118.    Defendant constructively terminated Hughes because of his protected activity.

119.    Prior to engaging in protected activity in December 2021, Hughes was a productive and successful employee.

120.    As an actual and proximate cause of Defendant's conduct, Hughes has suffered emotional distress, embarrassment, humiliation and lost wages and benefits.

121.    Due to Defendant's intentional disregard of Hughes federally protected rights under the ADA, Hughes seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendants. Hughes seeks backpay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorney's fees and litigation costs and expenses.

**COUNT III**
**FAILURE TO ACCOMMODATE**
**[ADA, 42 U.S. Code § 12101 et seq.]**

122.    Hughes incorporates by reference paragraphs 1 to 121 above.

123.    The ADA states that "the term discriminate against a qualified individual on the basis of   disability includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."   42 U.S. Code § 12112(b)(5)(A).

124.    Hughes requested reasonable accommodations including late start time, fixed start times and needed breaks.

125.    Defendant never approved any of his accommodation requests.

126.    Garber denied Hughes' accommodation requests for a late start time and fixed schedule as "unworkable."

127.    Flora Kelley-Bertsch twice tried to schedule a meeting with Hughes without honoring his accommodation requests to meet in a room with a window or outside.

128.    Flora Kelley-Bertsch diminished Hughes' neurocognitive disabilities as "anxiety."

129.    By any reasonable measure, accommodating Hughes was not an undue burden to The City of Charlottesville.

130.    Defendant failed to engage in the interactive process with Hughes.  Defendant had no discussion with Hughes to ascertain what accommodations could be offered to enable Hughes to continue to perform the essential functions of the position.

131.    As an actual and proximate cause of Defendant's conduct, Hughes has suffered physical injury, emotional distress, embarrassment, humiliation and lost wages and benefits.

132.    Due to Defendant's intentional disregard of Hughes federally protected rights under the ADA, Hughes seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendant.  Hughes seeks backpay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorney's fees and litigation costs and expenses.

### COUNT IV
### DISABILITY DISCRIMINATION
### THE REHABILITAION ACT OF 1973
### [29 U.S.C. § 791 et seq.]

133.    Hughes incorporates by reference paragraphs 1 to132 above.

134.    The Rehabilitation Act prohibits discrimination against any "otherwise qualified individual solely by reason of her or his disability." 29 U.S.C. § 794.

135.     To establish a violation, a plaintiff must prove: (1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability. *See Gates v. Rowland,* 39 F.3d 1439, 1445 (9th Cir.1994).

136.     To prevail on a claim under the portion of the Rehabilitation Act prohibiting

discrimination in federal grants and programs, a plaintiff must show that she was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, or subjected to discrimination by that entity.  29 U.S.C. § 504.

137.    Hughes is a person with physical and neurocognitive disabilities.

138.    In addition to being disabled, Hughes has a record of being disability and was perceived as disabled.

139.    Hughes is enrolled in the federally funded Ticket to Work program and is receiving SSDI benefits.

140.    Hughes has documented physical and neurocognitive disabilities.

141.    Upon information and belief, Defendant was a local partner and participant in the federal Ticket to Work program.

142.    Hughes was perceived as disabled by those individuals employed by Defendant saw his physical limitation and signs of his neurocognitive limitation, discussed his disabilities with him, reviewed his accommodation requests and paperwork and minimized his physical disabilities.

143.    Hughes is a qualified person with a disability and performed his job in line with his employer's reasonable expectations.

144.    Hughes was a successful and productive employee.

145.    Hughes was never issued write-ups, warnings, reprimands, or other disciplinary actions.

146.    Defendant repeatedly asked Hughes to work full-time hours even though he was enrolled in the Ticket to Work program, thereby potentially jeopardizing Hughes' status with the program and his SSDI benefits.

147.    Moffett targeted and repeatedly yelled at and demeaned Hughes.  He did not yell at and demean Lawson, an able-bodied employee.

148.    Upon information and belief, Moffett did not target and repeatedly yell and demean any able-bodied employee.

149.    Lawson was promoted to the maintenance position even though he was less experienced than Hughes.

150.    Lawson was transferred to another full-time position even though there were allegations of pending felony charges.

151.    The maintenance position offered to Hughes was ranked lower and had a lower salary than the position that Lawson held, although Hughes had more experience.

152.    Moffett discriminated by telling Hughes to stop advocating for his accommodations.

153.    Hughes was not permitted to maintain the full-time maintenance specialist position and his part-time instructor position, although nondisabled employee were.

154.    Defendant has no non-discriminatory reason for creating a hostile workplace and constructively discharging Hughes.

155.    As actual and proximate cause of Defendant's conduct, Hughes has suffered physical injury, emotional distress, embarrassment, humiliation, lost wages, and benefits.

156.    Due to Defendant's intentional disregard of Hughes federally protected rights under the Rehabilitation Act, Hughes seeks backpay and pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorney's fees and litigation costs and expenses.

## COUNT V
## RETALIATION
## THE REHABILITATION ACT OF 1973
## [29. U.S.C. § 791 et seq.]

157.     Hughes incorporates by reference paragraphs 1 to 156 above.

158.     To establish a prima facie case for retaliation under the Rehabilitation Act, plaintiff must show (1) that she engaged in protected activity, (2) that the employer acted in an adverse manner, and (3) that the protected activity was causally connected to the adverse action. Holland v. Wash. Homes, Inc. 487 F.3d 208, 218 (4th Cir. 2007).

159.     Hughes engaged in protected activity when he notified the Office of the Deputy City Manager for Racial Equity, Diversity, and Inclusion that his civil rights were being violated.

160.     Hughes engaged in protected activity when he filed discrimination complaints with the EEOC and the Virginia Office of the Attorney General.

161.     Hughes engaged in protected activity when he requested accommodations.

162.     Because Hughes engaged in protected activity, Moffett required Hughes to report to work before 10am (contrary to his accommodation requests) and escalated his abusive behavior creating a hostile workplace.

163.     Because Hughes engaged in protected activity, Garber retaliated by denying Hughes accommodation requests, threatening to immediately and permanently suspend him from teaching, threatened to put him on probation, yelled and demeaned him and ultimately drafted a resignation letter for Hughes.

164.     Because Hughes engaged in protected activity, Kelley-Bertsch did not approve or acknowledge his accommodation requests, accused Hughes of fabricating his disabilities, minimized his disabilities, and tried to compel Hughes to attend two meetings without accommodations in place.

165.     Hughes' protected activity and Defendant's adverse employment action were causally connected and related.

166.     Defendant constructively terminated Hughes because of his protected activity.

167.     As an actual and proximate cause of Defendant's conduct, Hughes has suffered emotional distress, embarrassment, humiliation and lost wages and benefits.

168.     Due to Defendant's intentional disregard of Hughes federally protected rights under the Rehabilitation Act, Hughes seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendants.  Hughes seeks backpay with pre and post judgment interest, front pay. Reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorney's fees and litigation costs and expenses.

**COUNT VI**
**FAILURE TO ACCOMMODATE**
**THE REHABILITAION ACT OF 1973**
**[29 U.S.C. § 791 *et seq*]**

169.     Hughes incorporates by reference paragraphs 1 to 168 above.

170.     To establish a prime facie case for failure to accommodate, a plaintiff must show that (1) he qualifies as an "individual with a disability"; (2) the employer had notice of his disability; (3) he could perform the essential function of his job with reasonable accommodation; and (4) the employer refused to make reasonable accommodation. *Wilson v. Dollar Gen. Corp., 717 F.3d 337. 345 (4th Cir. 2013).*

171.      Hughes is a person with physical and neurocognitive disabilities.

172.     On October 27, 2021, Hughes submitted his request for reasonable accommodations to Garber and Bertsch for a fixed schedule and late start time to manage his FND. The following day he submitted the necessary documentation to support his accommodation requests.

173.    On November 4, 2021, Kelley-Bertsch acknowledged receipt of Hughes' accommodation request.

174.    On November 12, 2021, Carr acknowledged that he was aware that Hughes had requested accommodations.

175.    Hughes could perform the essential function of his job with reasonable accommodations.

176.    The City never approved any of Hughes' accommodation requests.

177.    On October 27, 2021, Garber stated that Hughes's request for a fixed schedule and late start time was "unworkable" without further explanation.

178.     Garber never indicated that the requests were going to create an undue hardship for The City of Charlottesville.

179.    By any reasonable measure, accommodating Hughes was not an undue hardship for The City of Charlottesville.

180.    Defendant failed to engage in the interactive process with Hughes.  Defendant had no discussion with Hughes to ascertain what accommodations could be afforded to enable Hughes to continue to perform the essential functions of the position.

181.    As an actual and proximate cause of Defendant's conduct, Hughes suffered physical injury, emotional distress, embarrassment, humiliation and lost wages and benefits.

182.    Due to Defendant's intentional disregard of Hughes' federally protected rights under the Rehabilitation Act, Hughes seeks nominal, compensatory, and punitive damages to compensate him for harm inflicted by Defendant. Hughes seeks backpay with pre and post judgment interest, front pay, reimbursement for lost benefits, compensation for emotional distress, and repayment of his attorney's fees and litigation costs and expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Neil Hughes, respectfully requests that this Honorable Court enter judgment in his favor on all Counts of his Complaint and against Defendant and that he be awarded the following relief:

a) Entry of judgment in favor of Plaintiff an all Counts;

b) Award of reinstatement of front pay;

c) Award of back pay for Plaintiff against Defendant;

d) Award of compensatory damages for Plaintiff against Defendant;

e) Award of punitive damages for Plaintiff against Defendant;

f) Award of reasonable attorney's fees and litigation costs and expenses for Plaintiff against Defendant;

g) Award of pre and post judgment interest for Plaintiff; and

h) Any other relief that this Court deems equitable, appropriate, and just.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues triable.

Dated this 22nd day of June 2023.

Respectfully submitted,

*/s/Francisco E. Mundaca*
Francisco E. Mundaca, Esq. (VSB 96073)
THE SPIGGLE LAW FIRM, P.C.
3601 Eisenhower Ave, Suite 425
Alexandria, Virginia 22304
Telephone: (202) 449-8527
Facsimile: (202) 517-9179
E-Mail: fmundaca@spigglelaw.com
***Counsel for Plaintiff Neil Hughes***